IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

WILLIAM ROY THIETJE,

                Petitioner,

    vs.

MARCUS POLLARD, Warden, Richard J.
Donovan Correctional Facility,[1]

           Respondent.

No. 2:19-cv-02111-JKS

MEMORANDUM DECISION

William Roy Thietje, a state prisoner proceeding *pro se*, filed a Petition for a Writ of

Habeas Corpus with this Court pursuant to 28 U.S.C. § 2254.  Thietje is in the custody of the

California Department of Corrections and Rehabilitation and incarcerated at the Richard J.

Donovan Correctional Center.  Respondent has answered, and Thietje has not replied.

## I.  BACKGROUND/PRIOR PROCEEDINGS

On September 9, 2013, Thietje was charged by consolidated information with murder

(Count 1); two counts of assault with a deadly weapon (Counts 2, 3); hit and run (Count 4); three

counts of inflicting corporal injury on a spouse or cohabitant (Counts 5, 7, 8); two counts of

assault with force likely to cause great bodily injury (Counts 6, 9); and false imprisonment

(Count 10).  The information alleged that Thietje deliberately drove a van into the back of his ex-

girlfriend's unoccupied car, pushing the car toward of a group of people, one of whom fired a

shotgun into the van, killing Thietje's associate.  The charges carried allegations that Thietje had

previously been sentenced to prison and had not remained free of custody for five years, and that

---

[1]     Marcus Pollard, Warden, Richard J. Donovan Correctional Facility, is substituted
for Ken Clark, Warden, California State Prison–Corcoran.  Fed. R. Civ. P. 25(c).

he committed the instant offenses while on bail.  Thietje pleaded not guilty, denied the

enhancement allegations, and proceeded to a jury trial.  On direct appeal of his conviction, the

California Court of Appeals recounted the following facts underlying the charges against Thietje

and the evidence presented at trial:

> G. was [Thietje's] live-in girlfriend.  [Thietje] physically abused and threatened to kill G. during their relationship.  G. left [Thietje] in October 2012.
> On October 27, 2012, G.'s Cadillac was parked outside M. Lansdowne's house, in front of a chain link fence.  At about midnight, T. B. saw a van ram the Cadillac and speed off.  Lansdowne and G. went outside to investigate after they heard the crash.  Neighbor D. H. also came outside.  The Cadillac was pushed halfway through the chain link fence.
> G. recognized the van and said it was her ex-boyfriend's.  She went inside the house.  At trial, G. denied that she asked [Thietje] to go to Lansdowne's house.
> The van, its engine revving and travelling at a high rate of speed, returned a few minutes later.  [Thietje] was driving.  There were three people with [Thietje] .
> [Thietje] drove "pedal to the metal, crashing into the Cadillac" and the collision caused the Cadillac to rock back and forth.  Everyone was panicked and "freaking out."  T. B., D. H. and Lansdowne asked [Thietje] to leave.  They said G. was not going to come outside and they did not want any problems.
> When [Thietje] refused to leave, T. B. walked to the driver's side of the van to talk with [Thietje].  He picked up a stick because he felt threatened.  He did not know whether the people in the van were going to fight them and if they had weapons.  Lansdowne assumed the people in the van could have weapons.
> T. B. told [Thietje] to leave.  [Thietje] yelled that he was going to hurt everyone there, especially T. B., whom [Thietje] repeatedly called a pejorative term.  [Thietje] screamed for G. to come outside.  He said there was going to be a problem if G. did not come out.  He stepped on the gas, threatened to run the people in the yard over, and caused the van to lunge forward.
> Lansdowne went inside to get his shotgun.  He loaded the shotgun and put the safety on.  He heard the engine of the van "rev up" as he stepped out of the house.  [Thietje] backed the van up, revved the engine and drove forward. T. B. turned around and ran.  The van hit the Cadillac, making a loud sound, and pushed the Cadillac through the fence and into the yard.  T. B. was in the path of the Cadillac.  He felt the bumper of the car touch him.  If the Cadillac had continued forward, it would have run T. B. over and ended up a foot from the door of the house.  Lansdowne was concerned the van would also hit him.  He moved to his right to get out of the way and aimed for [Thietje's] chest to stop the van.  He fired two shots in close succession.  The van stopped.  The Cadillac was about 19 feet from the front door of the house.  [Thietje] backed out of the yard and took off.

2

At trial, Lansdowne denied that the van was backing out of the driveway at the time he fired his shotgun.  T. B.'s account was consistent, saying Lansdowne fired his shotgun after [Thietje] rammed the Cadillac and pushed it into the yard.  G. likewise testified she heard two gunshots a little bit after the sound of a collision.

B. Halbert died of a single gunshot wound to the head.  He was in the rear passenger seat behind [Thietje].  [Thietje] suffered an injury to his left ear and superficial wounds to his face.

California Highway Patrol Officer Simon Hamann opined that there were at least two collisions between the van and the Cadillac.  He concluded based on the physical evidence that the van, with its tires spinning, collided with the Cadillac and pushed the Cadillac toward the house.  The Cadillac was pushed 13.6 feet, bending a pole for the chain link fence.  During a separate collision, the van accelerated and pushed the Cadillac forward while the van was being steered to the left.  The driver of the van kept his foot on the accelerator the entire time the van was pushing the Cadillac.  The Cadillac was moved 5.82 feet.  Making certain assumptions, Officer Hamann opined it would have taken two and a half seconds to move the Cadillac 5.82 feet and the van was travelling about 8 miles an hour.  Officer Hamann testified, however, that he did not know whether the assumptions he made to calculate speed and time were true.

V. Colacino was granted immunity in relation to his testimony.  He was also interviewed by Deputy Sheriff Gene Randall on October 29, 2012.  Colacino's testimony and pretrial statement indicate the following:  [Thietje], Colacino, Halbert and D. Handmore went looking for G. on the night of the shooting.  [Thietje] drove the van.  When they got to the house, [Thietje] "punched it backwards and nailed the car."  They left to put water in the van's radiator and returned to slash the tires of the Cadillac and fight with the men who were at the house.  Colacino had a folding knife.  He gave the knife to Halbert.  [Thietje] argued with a man who was outside the van.  He threatened the man and repeatedly challenged the man to fight.  He rammed the Cadillac and pushed it through the fence, almost into the house.  Colacino heard the engine revving and the tires spinning.  There were people in the yard. Someone in the van yelled "gun."  Colacino heard a gunshot and ducked.

During his October 29, 2012 interview, Colacino provided an ambiguous statement about when he heard the gunshots.  His trial testimony on the subject was inconsistent.  He claimed he could not remember because he was under the influence of drugs and intoxicated on the night of the shooting.  He also claimed he had a learning disability and had trouble comprehending.

The People presented evidence that [Thietje] engaged in witness intimidation or tampering with regard to G. and Colacino and witness intimidation or tampering by [Thietje's] supporters in relation to G., T. B., Lansdowne, Colacino, and two other witnesses.

*People v. Thietje*, No. C078175, 2018 WL 3031695, at *1-3 (Cal. Ct. App. Jun. 19, 2018).

At the conclusion of trial, the jury found Thietje guilty of murder (Count 1), two counts of assault with a deadline weapon as to T.B. and Lansdowne (Counts 2, 3), hit and run (Count 4), corporal injury to a cohabitant (Counts 5, 6, 8), assault with force likely to cause great bodily injury (Counts 6, 9), and false imprisonment by violence (Count 10).  With regards to Counts 5, 6, and 7, the jury found true the special allegations of domestic violence with great bodily injury. Thietje admitted the special allegation that he had served a prison sentence for a 2009 conviction and did not remain free of prison custody for a period of five years after the conclusion of that prison term, and that he had committed an offense resulting in a felony conviction during that period.  He also admitted the special allegation that, at the time of the commission of the offenses charged in counts 1, 2 and 3, he was out on bail in another case.  The trial court subsequently sentenced Thietje to 15 years to life imprisonment on Count 1 and to a total determinate term of 16 years and 4 months on the other counts.

Through counsel, Thietje appealed his conviction, arguing that: 1) the trial court erred in refusing to grant a continuance to allow him to retain new counsel; 2) it was error to not instruct the jury that Thietje's alleged provocative act had to be something beyond an assault; 3) the trial court should have instructed the jury that Thietje was not guilty of murder if the conduct of the person who fired the fatal shot was an independent criminal act; 4) insufficient evidence supported the jury's finding that Thietje harbored implied malice and that his actions proximately caused the victim's death; 5) the trial court abused its discretion in failing to investigate juror misconduct after a juror reported a concern about safety; 6) insufficient evidence supported the finding that Thietje had the present ability to inflict injury and intended to assault the victim; and 7) cumulative error rendered the trial unfair.  The California Court of

4

Appeal unanimously affirmed the judgment against Thietje in a reasoned, unpublished opinion issued on June 19, 2018.  *Thietje*, 2018 WL 3031695, at *13.  Thietje petitioned for review in the California Supreme Court, which was summarily denied on October 10, 2018.

Thietje timely filed a *pro se* Petition for a Writ of Habeas Corpus in this Court on October 6, 2019.  Docket No. 1 ("Petition"); *see* 28 U.S.C. § 2244(d)(1),(2).  Briefing on this case is now complete, and the matter is before the undersigned judge for adjudication.

## II. GROUNDS/CLAIMS

In his *pro se* Petition before this Court, Thietje argues that: 1) it was error to not instruct the jury that Thietje's alleged provocative act had to be something beyond an assault; 2) the trial court should have instructed the jury that Thietje was not guilty of murder if the conduct of the person who fired the fatal shot was an independent criminal act; 3) the trial court abused its discretion in failing to investigate juror misconduct after a juror reported a concern about safety; 4) the cumulative effect of those errors warranted reversal of his convictions; and 5) his right to counsel was violated when the trial court refused to grant him a continuance to allow him to retain new counsel.

## III. STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2).  A state-court decision is contrary to federal law if the state court applies a rule that

contradicts controlling Supreme Court authority or "if the state court confronts a set of facts that are materially indistinguishable from a decision" of the Supreme Court, but nevertheless arrives at a different result. *Williams v. Taylor*, 529 U.S. 362, 406 (2000). The term unreasonable is a common term in the legal world. The Supreme Court has cautioned, however, that the range of reasonable judgments may depend in part on the nature of the relevant rule argued to be clearly established federal law. *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004) ("[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.").

The Supreme Court has explained that "clearly established Federal law" in § 2254(d)(1) "refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the time of the relevant state-court decision." *Id.* at 412. The holding must also be intended to be binding upon the states; that is, the decision must be based upon constitutional grounds, not on the supervisory power of the Supreme Court over federal courts. *Early v. Packer*, 537 U.S. 3, 10 (2002). Where holdings of the Supreme Court regarding the issue presented on habeas review are lacking, "it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'" *Carey v. Musladin*, 549 U.S. 70, 77 (2006) (citation omitted).

To the extent that the Petition raises issues of the proper application of state law, they are beyond the purview of this Court in a federal habeas proceeding. *See Swarthout v. Cooke*, 131 S. Ct. 859, 863 (2011) (per curiam) (holding that it is of no federal concern whether state law was correctly applied). It is a fundamental precept of dual federalism that the states possess primary authority for defining and enforcing the criminal law. *See, e.g.*, *Estelle v. McGuire*, 502 U.S. 62,

67-68 (1991) (a federal habeas court cannot reexamine a state court's interpretation and application of state law); *Walton v. Arizona,* 497 U.S. 639, 653 (1990) (presuming that the state court knew and correctly applied state law), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002).

In applying these standards on habeas review, this Court reviews the "last reasoned decision" by the state court.  *See Robinson v. Ignacio,* 360 F.3d 1044, 1055 (9th Cir. 2004) (citing *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002)).  A summary denial is an adjudication on the merits and entitled to deference.  *Harrington v. Richter*, 562 U.S. 86, 99 (2011).  Under the AEDPA, the state court's findings of fact are presumed to be correct unless the petitioner rebuts this presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

Thietje has not replied to Respondent's answer.  The relevant statute provides that "[t]he allegations of a return to the writ of habeas corpus or of an answer to an order to show cause in a habeas corpus proceeding, if not traversed, shall be accepted as true except to the extent that the judge finds from the evidence that they are not true."  28 U.S.C. § 2248; *see also Carlson v. Landon*, 342 U.S. 524, 530 (1952).  Where, as here, there is no traverse filed and no evidence offered to contradict the allegations of the return, the court must accept those allegations as true. *See Phillips v. Pitchess*, 451 F.2d 913, 919 (9th Cir. 1971).

IV. DISCUSSION

A.    *Instructional Errors* (Grounds 1, 2)

Thietje first raises two claims challenging the propriety of two instructions charged to the jury.  On direct appeal, the Court of Appeal agreed that the trial court erred with respect to the

two charges.  Specifically, the appellate court agreed that the trial court erred in instructing the jury on provocative act murder by failing to tell the jury that, in the absence of a proven intent to kill,  the provocative act—here, assault with a deadly weapon (the van)—must involve evidence sufficient to not only support the assault with a deadly weapon, but must supply something more. The Court of Appeal also concluded that the trial court erred in refusing to instruct the jury that the act of the shooter who killed the victim might constitute an independent intervening cause that absolved Thietje.  The Court of Appeal nonetheless concluded that the errors were harmless.

Because jury instructions in state trial are typically matters of state law, federal courts are bound by a state appellate court's determination that a jury instruction was not warranted under state law.  *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (noting that the Supreme Court has repeatedly held that "a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."); *see also Williams v. Calderon*, 52 F.3d 1465, 1480-81 (9th Cir. 1995).  An instructional error, therefore, "does not alone raise a ground cognizable in a federal habeas proceeding." *Dunckhurst v. Deeds*, 859 F.2d 110, 114 (9th Cir. 1986) (citation omitted).

A challenged instruction violates the federal constitution if there is a "reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence."  *Boyde v. California*, 494 U.S. 370, 380 (1990).  The question is whether the instruction, when read in the context of the jury charges as a whole, is sufficiently erroneous to violate the Fourteenth Amendment.  *Francis v. Franklin*, 471 U.S. 307, 309 (1985).  This Court must also assume in the absence of evidence to the contrary that the jury followed those instructions.  *Weeks v. Angelone*, 528 U.S. 225, 234 (2000);

*Richardson v. Marsh*, 481 U.S. 200, 206 (1987) (noting the "almost invariable assumption of the law that jurors follow their instructions"); *see Francis*, 471 U.S. at 323-24 & n.9 (discussing the subject in depth).

It is well-established that not only must the challenged instruction be erroneous but it must violate some constitutional right, and it may not be judged in artificial isolation but must be considered in the context of the instructions as a whole and the trial record. *Estelle*, 502 U.S. at 72. This Court must also bear in mind that the Supreme Court has admonished that the inquiry is whether there is a reasonable likelihood that the jury applied the challenged instruction in a way that violates the constitution and that the category of infractions that violate "fundamental fairness" is very narrowly drawn. *Id.* at 72-73. "Beyond the specific guarantees enumerated in the Bill of Rights, the Due Process clause has limited operation." *Id.* Where the defect is the failure to give an instruction, the burden is even heavier because an omitted or incomplete instruction is less likely to be prejudicial than an instruction that misstates the law. *See Henderson v. Kibbe*, 431 U.S. 145, 155 (1977). In those cases, the inquiry is whether the trial court's refusal to give the requested instruction "so infected the entire trial that the resulting conviction violates due process." *See id.* at 156-57; *Estelle*, 502 U.S. at 72. Moreover, even if the trial court's failure to give the instruction violated due process, habeas relief would still not be available unless the error had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993); *California v. Roy*, 519 U.S. 2, 5 (1996).

<u>Ground 1.</u>   *Provocative act murder instruction*

Thietje first argues that the trial court erred in not instructing the jury that his alleged

provocative act had to be something beyond assault.   The Court of Appeal considered and

rejected the claim as follows:

> The People prosecuted [Thietje] for murder under the provocative act murder
> doctrine.   Provocative act murder describes a type of murder in which, during the
> commission of a crime, someone other than the defendant is provoked by the defendant's
> conduct into a response that results in death.   (*People v. Concha* (2009) 47 Cal.4th 653,
> 663 (*Concha*); *Pizano v. Superior Court* (1978) 21 Cal.3d 128, 132-133; *People v. Lima*
> (2004) 118 Cal.App.4th 259, 261.)   The underlying crime in this case is [Thietje's]
> assault with a deadly weapon, the van.   When the underlying crime does not involve an
> intent to kill, the provocative act must be something beyond that necessary to commit the
> underlying crime.   (*People v. Briscoe* (2001) 92 Cal.App.4th 568, 582-583 (*Briscoe*);
> *accord People v. Baker-Riley* (2012) 207 Cal.App.4th 631, 636-638; *In re Aurelio R.*
> (1985) 167 Cal.App.3d 52, 59.)   The Court of Appeal in *In re Aurelio R.* explained that
> where the underlying crime does not inherently involve an intent to kill, requiring proof
> of an additional intentional and provocative act ensures the defendant acted with "an
> intent to kill or at least an intent to commit life-threatening acts" before he or she can be
> held liable for a death resulting from a third person's conduct.   (*In re Aurelio R.*, *supra*,
> 167 Cal.App.3d at pp. 59-60.)   The crime of assault with a deadly weapon does not
> require a finding of intent to kill.   (*People v. Williams* (2001) 26 Cal.4th 779, 788, 790
> (*Williams*); CALCRIM No. 875.)
>
> Counsel and the trial court discussed instructing the jury on provocative act
> murder with CALCRIM No. 560.   That instruction provided, in pertinent part, "A
> provocative act is an act: [¶] 1. [That goes beyond what is necessary to accomplish the
> <insert underlying crime>;] [¶] [AND [¶] 2.] Whose natural and probable consequences
> are dangerous to human life, because there is a high probability that the act will provoke
> a deadly response." (CALCRIM No. 560 (2014 ed.) p. 297.)   Counsel agreed it was not
> necessary to include the bracketed portion of the instruction.   The trial court concurred,
> reasoning that using a van to propel a car, with people present and at risk of being hit,
> indicated a wanton disregard for human life and was conduct sufficiently provocative to
> support a finding of implied malice; thus, nothing more was needed to support an implied
> malice theory.   But as we have explained, because assault with a deadly weapon does not
> require a finding of intent to kill, the trial court should have instructed with the bracketed
> language.   (*In re Aurelio R.*, *supra*, 167 Cal.App.3d at pp. 59-60; Bench Notes to
> CALCRIM No. 560 (2014 ed.) p. 300.)
>
> An instructional error that omits an element of an offense is subject to harmless
> error analysis under *Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705].
> (*People v. Gonzalez* (2012) 54 Cal.4th 643, 662-663 (*Gonzalez*); *People v. Flood* (1998)
> 18 Cal.4th 470, 502-503.)   Under that standard, reversal is not required when the record

shows beyond a reasonable doubt that the error did not contribute to the jury's verdict. (*Flood*, at p. 504; *Neder v. United States* (1999) 527 U.S. 1, 18-19 [144 L.Ed.2d 35, 53].)

As instructed, the jury could not convict defendant of murder without finding that he acted with malice because the trial court told the jury the following: a murder conviction requires a finding that defendant acted with a specific intent and/or mental state; the provocative act murder doctrine requires proof that defendant knew the natural and probable consequences of his provocative act were dangerous to human life and then acted with conscious disregard for life; and defendant had to intentionally commit an act whose natural and probable consequences were dangerous to human life because there was a high probability that the act would provoke a deadly response. The instructions given required the jury to find that [Thietje] harbored malice. Malice is express when the defendant harbors an intent to kill, and malice is implied when the defendant willfully does an act, the natural and probable consequences of which are dangerous to human life, and the person knowingly acts with conscious disregard for the danger to life that the act poses. (*Gonzalez*, *supra*, 54 Cal.4th at p. 653; *Concha*, *supra*, 47 Cal.4th at p. 660.) Thus, the jury had to have found that [Thietje] harbored an intent to kill or at least an intent to commit life-threatening acts. (*In re Aurelio R.*, *supra*, 167 Cal.App.3d at pp. 59-60.) Under the circumstances, the failure to instruct the jury that a provocative act is an act that goes beyond what is necessary to accomplish the crime of assault with a deadly weapon is harmless beyond a reasonable doubt. (*People v. Ervin* (2000) 22 Cal.4th 48, 91; *People v. Garrison* (1989) 47 Cal.3d 746, 789-790; *People v. Lyons* (1991) 235 Cal.App.3d 1456, 1462-1463.)

*Thietje*, 2018 WL 3031695, at *7-8.

Applying *Chapman v. California*, 386 U.S. 18 (1967), and *Neder v. United States*, 527 U.S. 1 (1999), the California Court of Appeal found harmless the trial court's erroneous failure to instruct the jury that the provocative act must go beyond what is necessary to accomplish the crime of assault with a deadly weapon. Under *Chapman*, "the test for determining whether a constitutional error is harmless . . . is whether it appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" *Neder*, 527 U.S. at 15 (quoting *Chapman*, 386 U.S. at 24). The U.S. Supreme Court has held that when a state court's "*Chapman* decision is reviewed under AEDPA, 'a federal court may not award habeas relief under § 2254 unless *the harmlessness determination itself* was unreasonable.'" *Davis v. Ayala*, 576 U.S. 257, 269 (2015) (quoting *Fry v. Pliler*, 551 U.S. 112, 119 (2007)). To prevail on this

claim, Thietje therefore must show that the state court's harmless error determination "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement." *Ayala*, 576 U.S. at 270-71 (internal quotation marks omitted) (quoting *Richter*, 562 U.S. at 103).

Thietje fails to satisfy this heavy burden. Notably, Respondent states in its response that the prosecution argued that the omission was cured by other instructions given. *See Francis*, 471 U.S. at 309 (claimed error in an instruction does not focus only on the challenged instruction but on all the instructions as a whole); *People v. Riley*, 110 Cal. Rptr. 3d 585, 295 (Cal. Ct. App. 2010) (finding instructional error cured where the instructions as a whole adequately informed the jury as to omitted element of challenged instruction). Thietje did not challenge Respondent's assertion by way of traverse. *See* 28 U.S.C. § 2248; *see also Phillips*, 451 F.2d at 919 (court must accept allegations in answer as true where no traverse is filed and no evidence offered to contradict them. Moreover, the Court cannot find unreasonable the Court of Appeal's determination that the jury necessarily found that Thietje acted with malice such that it had to have concluded that Thietje harbored an intent to kill or at least an intent to commit life-threatening acts, and consequently, must have determined that Thietje's actions had to have gone beyond what was necessary to accomplish the crime of assault with a deadly weapon. Accordingly, for the reasons persuasively articulated in the Court of Appeal's thorough and thoughtful consideration of this claim, the court's error in the jury instructions on provocative act murder did not have a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637 (internal quotation and citation omitted). The Court thus finds no basis to believe that Thietje's conviction was the result of an "extreme malfunction" of the state criminal justice system." *Richter*, 562 U.S. at 102. Thietje is therefore not entitled to relief on this ground.

12

<u>Ground 2.</u>     *Omission of intervening cause instruction*

Thietje similarly avers that the trial court should have instructed the jury that Thietje was

not guilty of murder if the conduct of the person who fired the fatal shot was an independent

criminal act.[2]  Defense counsel requested the instruction, arguing that Lansdowne's actions

constituted an independent criminal act because he did not shoot at the van as Thietje was

driving toward the Cadillac, but rather shot at the van as Thietje was backing out of the

driveway.  Counsel thus argued that, at the time of the fatal shot, Lansdowne had no legal

justification to use deadly force.  The trial court rejected the request, agreeing with the

prosecution that Lansdowne's actions were not independent of Thietje's assault.

On direct appeal, the Court of Appeal concluded that the instruction should have been

given because out-of-court statements by Colacino indicated that Lansdowne shot at the van

while Thietje was backing out of the driveway, providing substantial evidence that Lansdowne's

conduct was independent of Thietje's assault.  *Thietje*, 2018 WL 3031695, at *9.  The appellate

court nonetheless found the "error in declining to give the requested independent criminal act

instruction . . . harmless under any standard in light of the other instructions given."  *Id.*  The

court reasoned:

> The trial court told the jury that in order to convict [Thietje] of murder, the jury
> must find that Lansdowne killed Halbert in response to [Thietje's] provocative act and
> that Halbert's death was the natural and probable consequence of [Thietje's] provocative
> act.  Those instructions relate to whether [Thietje's] conduct proximately caused
> Halbert's death.  The trial court explained to the jury that Halbert's death was the natural
> and probable consequence of [Thietje's] provocative act if a reasonable person in
> [Thietje's] position would have foreseen that there was a high probability that his or her
> act could begin a chain of events resulting in someone's death.  Thus, the jury was

---

[2]     Under California law, an independent intervening cause absolves the defendant of
criminal liability.  *People v. Brady*, 29 Cal. Rptr. 3d 286, 294-95 (Cal. Ct. App. 2005).

required to determine whether it was reasonably foreseeable that [Thietje's] act would provoke a lethal response. Lansdowne shooting at the van could not have been a superseding cause if it was a reasonably foreseeable result of [Thietje's] conduct. The trial court further instructed that Halbert's death was the natural and probable consequence of [Thietje's] provocative act if Halbert's death would not have happened if [Thietje] had not committed the provocative act. The instructions given allowed defense counsel to argue that [Thietje] was not guilty of murder because Lansdowne's conduct was an independent criminal act. In particular, [Thietje's] trial counsel argued to the jury that [Thietje] had ended the underlying crime and was backing away when Lansdowne shot at the van, and Lansdowne armed himself and intended to kill someone even though no one was in danger at the time he fired at the van. Under the circumstances, the error in not giving the independent criminal act instruction is harmless.

*Thietje*, 2018 WL 3031695, at *9 (citations omitted).

Again, the Court of Appeal's conclusion is both reasonable and fully supported by the record. In light of the evidence, Thietje demonstrates no reasonable probability of a different result had the requested causation instruction been given. In particular, there was evidence to support that Lansdowne's response in firing his weapon was reasonably foreseeable to Thietje. As the Court of Appeal explained:

In this case, someone in the van yelled "gun," indicating that Lansdowne could be seen by the occupants of the van as he stood in front of the house. [Thietje] steered the van to the left as he accelerated and used the van to push the Cadillac forward. The location of expended shotgun shells indicated that Lansdowne was standing to the left of the van as it pushed the Cadillac forward. Lansdowne testified that the Cadillac would have ended up a foot off to the side of where he exited the house if it had continued forward, and Lansdowne was concerned the van would hit him. Lansdowne moved to get out of the way. He was five to eight feet from the door of the house. The Cadillac finally stopped about 19 feet from the door of the house.

*Thietje*, 2018 WL 3031695, at *13.

For the reasons persuasively articulated in the Court of Appeal's thoughtful consideration of this claim, the court's error in the jury instructions did not have a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637 (internal quotation and citation omitted). Thietje is therefore not entitled to relief on this ground.

14

B.      _Juror Misconduct_ (Ground 3)

Thietje next contends that the trial court abused its discretion in failing to investigate

juror misconduct after a juror reported a concern about safety.  On direct appeal, the Court of

Appeal laid out the following facts underlying this claim:

> Minutes before the jury announced that it had reached a verdict, the courtroom
> clerk advised the trial judge that Juror No. 3 told her during the noon hour that he had a
> concern about safety.  The clerk described her contact with Juror No. 3 on the record as
> follows: When the clerk opened the jury room to allow Juror No. 3 to retrieve his
> sunglasses, the juror inquired whether he could ask the clerk a question about a matter
> which was discussed "in the back."  The clerk responded that she could not talk to the
> juror about such matters.  Juror No. 3 said it was "regarding a safety concern."  The clerk
> again told Juror No. 3 she could not talk to him.  Nevertheless, Juror No. 3 said the jurors
> "have to disclose our names, where we work, where our spouses work and some of the
> jurors are concerned about that."  The clerk told Juror No. 3 to send the judge a note if he
> had a concern.  No note regarding safety was submitted to the trial court.
> [Thietje's] trial counsel said if the jurors discussed safety concerns, their
> discussions may have improperly influenced the verdict but he was not sure whether a
> motion for mistrial would be appropriate at that time.  He requested time to research the
> issue.  The trial judge acknowledged that the jury could not consider certain matters in
> reaching a verdict and there was quite a bit of evidence about [Thietje] or his supporters
> trying to intimidate witnesses.  The trial judge noted that when the jurors discussed the
> issues in the case, there could have been idle comments by one or more jurors wondering
> whether there was any risk to them.  But the trial judge said it was premature to ask for a
> mistrial and he would not even know how to canvas the jury about whether or not they
> discussed their personal security and whether those things influenced their verdict.  He
> said those matters may be better left to posttrial investigation.  The prosecutor agreed.
> The trial judge pointed out that the verdicts could be in [Thietje's] favor.  [Thietje's] trial
> counsel responded, "Therein lies the conundrum I'm in, your Honor."  The trial judge
> said he was not sure what defense counsel would find in doing research that would
> provide an answer and at least defense counsel had the information to decide what his
> next move may be depending on the verdict.  [Thietje's] trial counsel did not argue the
> point further and the trial court took the verdict.

_Thietje_, 2018 WL 3031695, at *10.

The Sixth Amendment guarantees criminal defendants the right to a "fair trial by a panel

of impartial, 'indifferent' jurors."  _Irvin v. Dowd_, 366 U.S. 717, 722 (1961); _see Dyer v._

_Calderon_, 151 F.3d 970, 973 (9th Cir. 1998).  While "[d]oubts regarding bias must be resolved

against the juror," *United States v. Martinez-Martinez*, 369 F.3d 1076, 1082 (9th Cir. 2004), a defendant "bears the burden of showing that a juror was actually biased against him or her and that the district court abused its discretion or committed manifest error when it failed to excuse the juror for cause," *United States v. Hanley*, 190 F.3d 1017, 1030 (9th Cir. 1999) (internal quotation marks and alteration omitted), *superceded by statute on other grounds as stated in United States v. Jose*, 780 F. App'x 464, 466 (9th Cir. 2019).  "If only one juror is unduly biased or prejudiced or improperly influenced, the criminal defendant is denied his Sixth Amendment right to an impartial panel."  *United States v. Hendrix*, 549 F.2d 1225, 1227 (9th Cir. 1977).

Here, however, Thietje fails to demonstrate the existence of juror bias.[3]  As the Court of Appeal recognized when it denied this claim on direct appeal, "Juror No. 3's statements to the clerk did not suggest, and there is no evidence that, the verdict was affected by fear or concern for public safety."  *Thietje*, 2018 WL 3031695, at *11 (citation omitted).  The appellate court further explained:

> As the trial court noted, evidence of witness intimidation was presented at the trial and the comment by Juror No. 3 could refer to idle comments made as the jury discussed such evidence.  The trial court said [Thietje] could investigate the matter after the verdict was read.  And [Thietje] brought a motion for a new trial based on alleged juror misconduct.  But as the trial court noted in denying that motion, [Thietje] failed to present any evidence that jurors improperly considered witness intimidation evidence in arriving at the verdict.
>
> Additionally, the trial court instructed the jury that any juror may send a signed note through the bailiff if he or she needed to communicate with the judge during deliberations.  The courtroom clerk likewise told Juror No. 3 to send the judge a note if he had a concern.  No jury note regarding a safety concern is in the record.

---

[3]     Indeed, Thietje's juror bias claim is seemingly foreclosed by the defense's failure to request, after the jury's discharge, inquiry into any fear of Thietje or his friends that the jury may have had.  It does not appear that Thietje has claimed in either this Court or the state court that trial counsel was ineffective in this regard.

> Although the trial court could have responded differently to the information presented [by admonishing jury in response to note from a juror expressing safety concern], we find no abuse of discretion because the trial court did not have information suggesting a juror could not perform his or her duty to render an impartial and unbiased verdict.
>
> Additionally, the trial court instructed the jury not to let bias influence its decision, and that it must find [Thietje] not guilty unless the evidence proved [Thietje's] guilt beyond a reasonable doubt. In the absence of evidence to the contrary, and none has been presented, we presume the jury followed the trial court's instructions.

*Thietje*, 2018 WL 3031695, at *11 (citations omitted).

Moreover, a trial judge's finding that a juror was not biased is a factual finding presumed to be correct because "resolution [of the juror impartiality issue] depends heavily on the trial court's appraisal of witness credibility and demeanor." *Thompson v. Keohane*, 516 U.S. 99, 111 (1995); *see, e.g.*, *Wainwright v. Witt*, 469 U.S. 412, 428-29 (1985); *Patton v. Yount*, 467 U.S. 1025, 1038 (1984). This presumption of correctness also applies to implicit factual findings. *Tinsley v. Borg*, 895 F.2d 520, 525 (9th Cir. 1990). Here, Thietje's bare assertion that the juror was biased does not meet his burden of adducing clear and convincing evidence sufficient to overcome the presumption of correctness afforded the trial court's implicit finding of impartiality. *See* 28 U.S.C. § 2254(e)(1). Accordingly, the state court's rejection of Thietje's juror bias claim did not contravene or unreasonably apply federal law, and Thietje cannot prevail on this claim.

C.    *Cumulative Error* (Ground 4)

Thietje further argues, as he did on direct appeal, that the cumulative effect of the trial court's errors warrants reversal of his conviction. The Ninth Circuit has stated "[t]he Supreme Court has clearly established that the combined effect of multiple trial court errors violates due process where it renders the resulting trial fundamentally unfair." *Parle v. Runnels*, 505 F.3d

17

922, 927 (9th Cir. 2007) (citing *Chambers v. Mississippi*, 410 U.S. 284, 298 (1973)); *see also*

*Whelchel v. Washington*, 232 F.3d 1197, 1212 (9th Cir. 2000). "Cumulative error applies where,

although no single trial error examined in isolation is sufficiently prejudicial to warrant reversal,

the cumulative effect of multiple errors has still prejudiced a defendant." *Jackson v. Brown*, 513

F.3d 1057, 1085 (9th Cir. 2008) (quoting *Whelchel v. Washington*, 232 F.3d 1197, 1212 (9th Cir.

2000)). Where "there are a number of errors at trial, 'a balkanized, issue-by-issue harmless error

review' is far less effective than analyzing the overall effect of all the errors in the context of the

evidence introduced at trial against the defendant." *United States v. Frederick*, 78 F.3d 1370,

1381 (9th Cir. 1996) (quoting *United States v. Wallace*, 848 F.2d 1464, 1476 (9th Cir. 1988)).

"While the combined effect of multiple errors may violate due process even when no

single error amounts to a constitutional violation or requires reversal, habeas relief is warranted

only where the errors infect a trial with unfairness." *Peyton v. Cullen*, 658 F.3d 890, 896-97 (9th

Cir. 2011) (citing *Chambers*, 401 U.S. at 298, 302-03). Such "infection" occurs where the

combined effect of the errors had a "substantial and injurious effect or influence in determining

the jury's verdict." *Brecht*, 507 U.S. at 623 (citation omitted). In other words, where the

combined effect of individually harmless errors renders a criminal defense "far less persuasive

than it might [otherwise] have been," the resulting conviction violates due process. *See*

*Chambers*, 401 U.S. at 294.

Here, the Court of Appeal rejected Thietje's cumulative error claim because it did not

find any prejudicial error. Thietje fares no better on federal habeas review. Because, as

discussed throughout this opinion, Thietje does not demonstrate any prejudicial federal

constitutional error, he fails to establish prejudice in the aggregate. *See, e.g.*, *Hayes v. Ayers*,

18

632 F.3d 500, 524 (9th Cir. 2011) ("Because we conclude that no error of constitutional magnitude occurred, no cumulative prejudice is possible.").  The Court of Appeal did not unreasonably apply *Chambers v. Mississippi*, 410 U.S. 284 (1973), by rejecting Petitioner's claim of cumulative error.  Because Thietje failed to show any individual constitutional errors requiring reversal, fairminded jurists could reasonably agree with the Court of Appeal that any alleged individual errors did not cumulatively render Thietje's trial "fundamentally unfair." *Parle*, 505 F.3d at 928-930.  Thietje's cumulative error claim therefore must fail.

D.    *Denial of Continuance/Violation of Right to Counsel* (Ground 5)

Finally, Thietje renews his direct appeal argument that the trial court deprived him of his right to counsel by denying his motion to continue sentencing to retain new counsel.  On direct appeal, the Court of Appeal laid out the following factual background:

> After the verdict, [Thietje's] trial counsel David Nelson asked for extra time to prepare a motion for new trial based on alleged juror misconduct.  The trial court set a date for hearing posttrial motions and for sentencing, but on the day set for the hearing, attorney Michael Borges informed the trial court that [Thietje] was interested in retaining him to file a motion for new trial and to represent [Thietje] at sentencing.  Mr. Borges requested a 60-day continuance so that [Thietje's] supporters could come up with the money for his retainer.  Mr. Nelson did not object to a continuance, saying he was not prepared to proceed with sentencing because he received the probation report less than five court days prior and had not reviewed the report with [Thietje].
>
> The prosecutor objected to a continuance, saying "I don't believe an attorney coming in to specially appear who has not been retained is good cause to continue this hearing."  She added that the victims were entitled to a prompt and final conclusion of the case.  The prosecutor asked the trial court to sentence [Thietje] within the next two weeks because G. was set to be sentenced in another matter soon after that and G.'s sentencing was "pending the final outcome" in [Thietje's] case.
>
> The trial court indicated it was not inclined to continue the matter 60 days based on a possibility that [Thietje] could retain Mr. Borge.  But the trial court granted Mr. Nelson's request for a continuance to review the probation report with [Thietje].  Although it did not continue the matter for three weeks as Mr. Nelson requested, the trial court continued the matter two weeks.  It observed that the continuance would give [Thietje] and his supporters time to retain Mr. Borges.  It admonished Mr. Borges to notify [Thietje's] supporters that urgency was needed in the matter.  And it warned that

the continuance was not an indication that it would grant a request for substitution of counsel.

On the continued hearing date, Mr. Borges advised the trial court that although they were "very close," arrangements to retain him had not yet been completed.  Mr. Borges requested a four-week continuance.

The prosecutor objected to another continuance.  She said if the trial court granted a further continuance there was no guarantee Mr. Borges could be retained and if he was retained, Mr. Borges did not say he would be ready to proceed in four weeks.  She again asserted the victims' rights to have the case finalized.

Mr. Nelson told the trial court [Thietje] had lost confidence in him and wanted to hire another attorney before sentencing.  He affirmed that [Thietje] wished to dismiss him.  He urged that there were significant issues concerning juror misconduct and the admission of witness intimidation evidence at trial.  He added there were issues "other counsel may want to explore" that he was not prepared to do personally, and it would be in [Thietje's] best interest to retain other counsel before sentencing because certain remedies could not be explored once the trial court imposed a sentence.  Mr. Nelson requested a continuance but did not specify how much time [Thietje] wanted.

The trial court acknowledged that [Thietje] could discharge his retained counsel at any time.  It did not deny [Thietje's] request to discharge Mr. Nelson, but warned [Thietje] that firing Mr. Nelson could leave [Thietje] unrepresented because the trial court may not permit Mr. Borges to substitute in as counsel.  The trial court explained that it must consider the interests of the victims in deciding [Thietje's] request for a continuance, and the victims had a right to a speedy judgment and sentencing.  The trial court noted it had been three months since the verdict, and the trial court had previously explained why time was of the essence.  Given the uncertainty of whether or when Mr. Borges could be retained, the trial court said it could not keep rescheduling sentencing.  The trial court said [Thietje's] effort to dismiss Mr. Nelson was for the purpose of frustrating the administration of justice.

When Mr. Borges declined to make a general appearance that day, the trial court indicated it would allow [Thietje] to represent himself or appoint substitute counsel; however, appointed counsel must proceed that afternoon.  The trial court subsequently reiterated that [Thietje's] efforts to substitute new counsel were belated and for the purpose of frustrating the interests of justice and undermining the rights of others.  The trial court said [Thietje] and his supporters should have acted with urgency in retaining substitute counsel if they believed [Thietje's] trial counsel had been deficient, but they did not do that.  Therefore, the trial court would not continue the matter further.

[Thietje] indicated he wanted to dismiss Mr. Nelson and have the trial court appoint substitute counsel.  Pursuant to a suggestion by Mr. Nelson and the prosecutor, the trial court contacted the attorney who initially represented [Thietje] in the case.  The trial court was willing to appoint [Thietje] substitute counsel without granting a further continuance, but [Thietje] said he would proceed with Mr. Nelson.  After confirming [Thietje's] decision to proceed with Mr. Nelson, and Mr. Nelson's willingness to continue representing [Thietje], the trial court heard [Thietje's] new trial motion and sentenced him.

*Thietje*, 2018 WL 3031695, at *3-4.

"[T]rial courts 'necessarily require a great deal of latitude in scheduling trials' and are therefore accorded broad discretion on matters of continuances." *Bradley v. Henry*, 510 F.3d 1093, 1103 (9th Cir. 2007) (quoting *Morris*, 461 U.S. at 11). Accordingly, although the Sixth Amendment entitles criminal defendants who do not require appointed counsel to choose their attorneys, a trial court has "wide latitude in balancing the right to counsel of choice against the needs of fairness, and against the demands of its calendar." *United States v. Gonzalez-Lopez*, 548 U.S. 140, 144 (2006) (citations omitted); *see also United States v. Walters*, 309 F.3d 589, 592 (9th Cir. 2002) ("'A criminal defendant's exercise of this right [of counsel of choice] cannot unduly hinder the fair, efficient and orderly administration of justice.'" (citation omitted)). Thus, a trial court's denial of a defendant's request for a continuance does not necessarily infringe upon his Sixth Amendment rights even when it results in the defendant remaining unrepresented at trial or remaining with a public defender whom the defendant believes is not adequately prepared for trial. *See, e.g.*, *McCormick v. Adams*, 621 F.3d 970, 980 (9th Cir. 2010) (finding no constitutional error in denial of requested continuance so that counsel could be reappointed for defendant who earlier had waived counsel); *Houston v. Schomig*, 533 F.3d 1076, 1079 (9th Cir. 2008) (finding no constitutional error when the trial court denied the defendant's request for a continuance so he could retain private counsel out of concern that his public defender's preparation for trial was unsatisfactory).

"[O]nly an unreasoning and arbitrary 'insistence upon expeditiousness in the face of a justifiable request for delay' violates the right to the assistance of counsel." *Morris*, 461 U.S. at 11-12 (quoting *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964)). There are no "mechanical tests"

for determining when a scheduling decision was so arbitrary that it violated due process.  *Ungar*, 376 U.S. at 589; *United States v. Kloehn*, 620 F.3d 1122, 1127 (9th Cir. 2010).  Instead, a federal habeas court must examine the circumstances in which the decision was made and the facts known to the trial court at the time.  *Ungar*, 376 U.S. at 589.  In particular, the court must consider the petitioner's diligence in preparing for trial, the utility of the continuance, the probability that the objective of the continuance would have been achieved, and the extent to which the continuance would inconvenience the trial court and the opposing party.  *See Armant v. Marquez*, 772 F.2d 552, 556-57 (9th Cir. 1985); *see also Kloehn*, 620 F.3d at 1127 (listing these factors).  Moreover, to succeed on a due process claim arising out of a denial of a continuance, the petitioner must, at a minimum, show some prejudice resulting from the court's denial.  *Armant*, 772 F.2d at 556-57; *see also Kloehn*, 620 F.3d at 1127.

Consideration of these factors do not weigh in favor of Thietje.  As the Court of Appeal reasoned:

> Here, nothing suggests that [Thietje] belatedly discovered the facts underlying a potential motion for a new trial.  Yet he did not inform the trial court of his intent to substitute Mr. Nelson until the sentencing.  No explanation was given for [Thietje's] day-of-sentencing request.  The record also does not contain any written notice that [Thietje] would seek to continue the sentencing hearing or a show of good cause for [Thietje's] failure to file a written notice.
>
> [Thietje] now argues that he could not be expected to present a written request for new counsel before the sentencing date because he was functionally illiterate.  While [Thietje's] trial counsel represented that [Thietje] was functionally illiterate, [Thietje's] cell phone records show he was capable of communicating in writing.  [Thietje] did not explain in the trial court why he, Mr. Nelson or Mr. Borges could not inform the trial court of his wish to substitute counsel before the sentencing date.  Nevertheless, the trial court gave [Thietje] an additional two weeks to retain Mr. Borges.  Thus, [Thietje] had about three months to retain substitute counsel but failed to do so.
>
> There was no assurance that [Thietje] and his supporters would retain Mr. Borges.  And [Thietje] did not demonstrate that he and his supporters had acted with due diligence, even though the trial court admonished them two weeks earlier that they had to act with urgency if they wanted to retain Mr. Borges.  Further, as the prosecutor pointed

22

out, even if the trial court were to grant [Thietje's] request for an additional continuance, there was no showing when Mr. Borges would be ready to proceed.  Mr. Borges did not say he would be ready to proceed with posttrial motions and sentencing in four weeks' time or how much time he needed to prepare posttrial motions if he was retained.  Thus, the trial court was faced with the possibility that four months after the verdict, the matter would be further delayed because [Thietje's] supporters could not raise the money to retain Mr. Borges and because new counsel would require time to prepare.  Under those circumstances, the trial court reasonably concluded it could not repeatedly continue sentencing on the chance that Mr. Borges would be retained to represent [Thietje].

[Thietje] attempts to place the burden of eliciting the existence of good cause on the trial court, but the burden was on [Thietje] to affirmatively prove the grounds for his request.  Denial of continuance is proper where, as here, the prospect of hiring private counsel was still speculative at the time [Thietje] moved for a continuance.

Additionally, in California, victims have a right to a prompt conclusion of the case.  By the time of the continued sentencing date, over two years had elapsed since the commission of the charged offenses.  The prosecutor raised a concern affecting another case: a continuance beyond two weeks in [Thietje's] case would postpone the sentencing of G. in a separate matter.

[Thietje] argues there is no support in the record for the trial court's statement that the request for continuance was a ploy to undermine the rights of the victims and frustrate the interests of justice.  But the record shows [Thietje] repeatedly requested sentencing continuances without notice and without a showing of good cause.  We cannot say the comments by the trial judge, who was in the best position to observe [Thietje] and his counsel, were arbitrary.

The trial court properly balanced [Thietje's] right to choice of counsel with the rights of the victims and the interest of the People in a prompt conclusion of the case.  The trial court did not abuse its discretion in denying [Thietje's] motion for a further continuance.

*Thietje*, 2018 WL 3031695, at *6-7.

The appellate court's determination is both reasonable and fully supported by the record.

Ultimately, this Sixth Amendment claims fails because, for the reasons explained by the Court of

Appeal, the trial court did not abuse its discretion through an "unreasoning and arbitrary

insistence upon expeditiousness in the face of a justifiable request for delay."  *Houston*, 533 F.3d

at 1079 (quoting *Morris v. Slappy*, 461 U.S. 1, 11-12 (1983)) (internal quotation marks omitted).

The state court's rejection of this claim was not contrary to or an unreasonable application of

Supreme Court precedent, and this claim must be denied.

23

## V. CONCLUSION AND ORDER

Thietje is not entitled to relief on any ground raised in his Petition.

**IT IS THEREFORE ORDERED THAT** the Petition under 28 U.S.C. § 2254 for Writ

of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Court issues a Certificate of Appealability

solely with respect to Thietje's instructional error claims (Grounds 1 and 2).  *See* 28 U.S.C.

§ 2253(c); *Banks v. Dretke*, 540 U.S. 668, 705 (2004) ("To obtain a certificate of appealability, a

prisoner must 'demonstrat[e] that jurists of reason could disagree with the district court's

resolution of his constitutional claims or that jurists could conclude the issues presented are

adequate to deserve encouragement to proceed further.'" (quoting *Miller-El*, 537 U.S. at 327)).

Any further request for a Certificate of Appealability must be addressed to the Ninth Circuit

Court of Appeals.  *See* FED. R. APP. P. 22(b); 9TH CIR. R. 22-1.

The Clerk of the Court is to enter judgment accordingly.

Dated: July 23, 2021.

    /s/James K. Singleton, Jr.     

JAMES K. SINGLETON, JR.

Senior United States District Judge

24